ISHEE, J.,
for the Court.
¶ 1. Following a trial in the Chancery Court of Covington County, the chancellor entered a judgment finding a disputed road to be a private road and, thereby, rejecting the claim of Covington County that the road was a public road. Joined in the suit with the County were Richard Collins, Sennett Dickens — administrator for the Estate of Harold Gene Jones (the Estate), deceased,[1] and Ralph M. Vaughn — trustee of the Ralph Murphy Vaughn Revocable Trust.[2] Additionally, the chancellor awarded prescriptive easements to the parties whose lands bordered G.K. Lane to allow them to use the road. Aggrieved by the judgment, Willie George Knight (Knight) appeals, asserting that the chancellor erred by (1) failing to find that Knight had acquired title to the property by adverse possession, (2) awarding prescriptive easements over G.K. Lane to the parties, and (3) failing to award Knight damages and attorney’s fees from Coving-ton County.[3]
¶2. Finding no error, we affirm the chancellor’s judgment.
FACTS AND PROCEDURAL HISTORY
¶ 3. The road at issue in the present case is G.K. Lane, which is located in Covington County, Mississippi. G.K. Lane runs east-west across the property of Harold Jones, who was represented in this case by Dickens. The road begins at a point on Salem School Public Road and ends on the property of Collins. Knight’s property is located to the north of G.K. Lane, and the Estate’s property is located to the south of G.K. Lane. Vaughn’s property is located at the northeastern end of G.K. Lane, at the point where it intersects Salem School Public Road. The driveways to Vaughn’s home and Knight’s home are located on G.K. Lane.
¶ 4. Sometime in early 2000, Knight placed a gate across G.K. Lane, which obstructed access to the road for the other parties who had previously used the road for ingress to and egress from their properties. Thereafter, on February 9, 2001, the County filed suit to have G.K. Lane declared a public road, which would require the gate to be removed. Trial began in this matter in May 2001, but the matter was delayed until February 2002, so the necessary parties could be brought into the action.
¶ 5. The former supervisor for the County, Allison Moody, testified that G.K. Lane had been in existence since the Civil War era. He said that he had been familiar with the road since the 1930s or 1940s when a cousin of his lived there. During his term as supervisor, from 1984 through 2000, he maintained the road as a county road. Maintenance included graveling and grading the road. The County also named the road and placed a street sign at the end of the road. Moody never requested permission from anyone to do work on the *1166 road, and he never received any objections from Knight’s father. There was neither a gate at the end of the road nor any obstruction to block public traffic from using the road. According to Moody, the county maps naming public roads labeled G.K. Lane as a public road in 1997, 1999, and 2000.
¶6. Lilan Norris, who worked for the supervisor who preceded Moody, also testified that G.K. Lane was maintained as a public road.
¶ 7. From approximately 1950 until 1957, William Harvey owned the property at the end of G.K. Lane that Collins owned at the time of trial. He always considered G.K. Lane to be a public road, and he said there was never a gate across it. He testified that the County maintained the road by graveling and grading it and installing a culvert. Harvey said that Knight’s father never interfered with his use of the road.
¶ 8. Harvey transferred title of the property to Stanley Jones and William Padgett in 1957. It was during Stanley’s ownership of the back property that Knight’s father acquired the property to the north of G.K. Lane. Stanley said that he did not have any agreement with Knight’s father concerning the use of the road; he just considered it to be public. According to Stanley, the school bus and the mail carrier would drive all the way down the road to his property, and the County would maintain the road. It was Stanley’s understanding that the party who owned land to the south of the road, Maston Jones— predecessor-in-title to the Estate — erected a fence along the southern border of the road to fence in his cows.
¶ 9. Collins purchased the property from Stanley in 1993, and Collins said that at that time, there were fences along the northern borders of G.K. Lane. He said that Knight removed the northern fence about three months after Knight’s father died. Collins testified that the only way to access the main portion of his property is via G.K. Lane. He also testified that the mail carrier would use the road, as well as people such as hunters and timber cutters, who Collins allowed to use his property.
¶ 10. Knight testified that G.K. Lane was not a public road, but he believed the land was described in the deed to Maston Jones. Nevertheless, he said that he and his father had used the road since his father purchased the land to the north of the road in the 1950s. Knight said that he placed a gate on the road to prevent power company workers from entering his land. Initially, the gate was partially down the road, near his driveway. He gave his stepmother a key to the gate, who gave Collins a key. After his stepmother died, he moved the gate to the end of the road, near the point where it joins Salem School Public Road.
¶ 11. Additionally, Knight offered the testimony of a number of his relatives. They testified that they did not see anyone from the County maintaining the road and that it was not a public road. Robert Johnson, a county employee, recounted one instance when Knight’s father told him not to do any work on the work. After that, he did not bushhog the road anymore.
¶ 12. Jerry Miller surveyed the area around G.K. Lane on February 4, 2002, and he proved the points from a survey conducted by David Dunn for Knight in 2001. Miller testified that the old fence line to the north of the road was pretty close to Knight’s property line. He had also previously conducted a survey in 2000 for Collins. At the time that Miller surveyed the land in 2000, the fence to the north of G.K. Lane was still in place. During that survey, Knight told Miller and Collins not to cross the fence to the north *1167 of the road, or somebody would be leaving in a body bag.
¶ 13. In the final judgment, the chancellor found that G.K. Lane was at one time a public road. However, after the County allowed a fence to be placed on the road, which was the fence at the entrance to Collins’s property, the road lost its status as a public road. Thereafter, the chancellor found that the various travel on the road did not reestablish it as a public road. It was the chancellor’s conclusion that the road is located partially on the Estate’s land and partially on Knight’s land. Nevertheless, the chancellor found that the adjacent landowners’ use was sufficient to constitute a prescriptive easement. The chancellor issued a second final judgment in response to a motion for clarification. In it, the chancellor denied the motion for a new trial. The chancellor provided more detailed findings of fact and clarified that the use by the Joneses, the Knights, the Collinses, and their predecessors-in-title was sufficient to award a prescriptive easement to the parties whose land bordered G.K. Lane. Therefore, the chancellor awarded a prescriptive easement in favor of those parties. From that judgment, Knight filed the present appeal.
STANDARD OF REVIEW
¶ 14. This Court will not disturb the findings of a chancellor unless those findings were manifestly in error, clearly erroneous, or were the result of the application of an erroneous legal standard. Keener Props., L.L.C. v. Wilson, 912 So.2d 954, 956(113) (Miss.2005) (citing Nichols v. Funderburk, 883 So.2d 554, 556(117) (Miss.2004)). If there is substantial evidence in support of a chancellor’s findings, this Court may not disturb a chancellor’s conclusions. Id. Of course, we will review an issue of law under a de novo standard. Id. (citing Weissinger v. Simpson, 861 So.2d 984, 987(¶ 11) (Miss.2003)).
DISCUSSION
I. Whether the chancellor erred by refusing to find that Knight had acquired title to the property by adverse possession.
¶ 15. First, Knight argues that the chancellor erred in failing to award him title of G.K. Lane by adverse possession. Knight claims that he and his father continuously occupied and maintained G.K. Lane for more than the ten years required to constitute adverse possession. According to Knight, there was no evidence to rebut his claim of adverse possession. He argues such even though the central issue of the trial was actually whether G.K. Lane was a public or private road and even though he offered little evidence to support a finding of adverse possession.
¶ 16. “[F]or possession to be adverse it must be (1) under claim of ownership; (2) actual or hostile; (3) open, notorious, and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful.” Blackburn v. Wong, 904 So.2d 134, 136(¶ 15) (Miss.2004) (citing Thornhill v. Caroline Hunt Trust Estate, 594 So.2d 1150, 1152-53 (Miss.1992)). The party claiming adverse possession must prove each element by clear and convincing evidence. Id. (citing Thornhill, 594 So.2d at 1153).

1. Under Claim of Ownership

¶ 17. Aside from Knight’s own testimony, there is little to no evidence that Knight’s father occupied G.K. Lane under a claim of ownership. To the contrary, the attorney for the guardian of Jones, elicited the following testimony from Knight on cross-examination:
*1168 Q: Mr. Knight, you’re not saying that your father or you neither one ever had a deed to this G.K. Lane, did you?
A: I don’t really understand your question, Mr. Keys.
Q: You don’t claim to have a deed to that G.K. Lane, do you?
A: No, sir. We’ve used it for 50 years without any problems.
Q: Just answer my question. You don’t claim to have a deed to it, do you?
A: No, sir.
Q: And neither did your father have a deed to it?
A: No, sir.
Q: Because that land is describe[d] in the deeds to Maston Jones, is it not?
A: Yes, sir, the road comes in through the Maston Jones place just like it goes over to Mr. Johnson’s place. But the County hasn’t seen fit to make that a public road.
Q: Just answer my question if you will. That G.K. Lane as it exists today is described in the Maston Jones deed, is it not?
A: Probably.
Based on the lack of supporting evidence, as well as Knight’s own testimony to the contrary, we find that Knight did not prove by clear and convincing evidence that he or his father occupied G.K. Lane under a claim of ownership.

2. Actual or Hostile

¶ 18. Knight argues that the element of hostility was satisfied by (1) Johnson’s testimony that Knight’s father stopped him from working on G.K. Lane, and (2) the fact that Knight placed gates across the road. Johnson’s testimony does speak to this element of adverse possession, but it did not prove hostility by clear and convincing evidence. To the contrary, there was ample testimony that the County maintained G.K. Lane, and Miller, the surveyor, testified that Knight’s father only excluded him from crossing the fence to the north of the road. Knight did place a gate across the road, but it was the act of placing the gate and moving it to the end of the road that instigated the present lawsuit.

3. Open, Notorious, and Visible

¶ 19. There was testimony from Knight’s relatives that his father openly used and maintained G.K. Lane. However, there was also ample testimony from the County’s witnesses that others openly used the road and that the County undertook some of the maintenance.

U. Continuous and Uninterrupted for a Period of Ten Years

¶ 20. There did not seem to be any dispute that Knight’s father and Knight used G.K. Lane ever since Knight’s father purchased the property to the north of the road in 1956. However, their use coincided with use by the adjacent landowners.

5. Exclusive

¶21. In Keener, the supreme court quoted the following language regarding the exclusivity requirement as it applies to a claim of adverse possession:
The question in the end is whether the possessory acts relied upon by the would be adverse possessor are sufficient to fly his flag over the lands and to put the record title holder upon notice that the lands are held under an adverse claim of ownership. It was not necessary for Buford or Soterra to exclude others from the use of the road, but only that there was “an intention to possess and hold land to the exclusion of, and in *1169 opposition to, the claims of all others, and the claimant’s conduct must afford an unequivocal indication that he is exercising dominion of a sole owner.”
Keener, 912 So.2d at 956-57(¶ 6) (quoting Lynn v. Soterra, Inc., 802 So.2d 162, 167-68(¶ 17) (Miss.Ct.App.2001)) (internal citations omitted).
¶ 22. In Soterra, this Court went on to note that the parties had proved exclusive use and that “someone with perfect title does not endanger it by giving permission to others to enjoy the property as well. The other users are not hostile to the owner, since they are using with implied or explicit permission.” Soterra, 802 So.2d at 168(¶ 17). A key factor in finding that the claimant in Soterra met the exclusivity requirement was that others would ask for permission from the claimant to use the land claimed to be adverse. Id.
¶ 28. In the present case, the chancellor determined that there was not clear evidence to establish Knight’s exclusive use of the road. Specifically, the chancellor noted that G.K. Lane had been used by “all owners and predecessors in title to the lands adjoining the lane for their use and their visitorsf] use.” After considering Knight’s argument and reviewing the record before us, we see no error in the chancellor’s determination on this element of adverse possession. Knight put on one witness who testified that his father refused to allow county employees to perform maintenance work on G.K. Lane. Some of Knight’s family members also testified that some people using the road would stop at Knight’s father’s house when they came down the road.
¶ 24. Nevertheless, Knight was required to prove his claim by clear and convincing evidence. The County presented a number of witnesses who testified that anyone was free to use G.K. Lane at any time. The County also called witnesses — including a former supervisor, a highway department employee, and prior owners of the adjacent lands — who testified that G.K. Lane had always been maintained as a county road. We find no error with the chancellor’s determination that the evidence before him fell short of establishing exclusive use by Knight and his father.

6. Peaceful

¶ 25. There was no evidence of any disputes or hostility among the various parties who owned land adjoining G.K. Lane.

7. Conclusion

¶26. In refusing to find that Knight had acquired title to G.K. Lane by adverse possession, the chancellor’s sole finding was that the road was used by all the adjacent landowners, their predecessors-in-title, and their visitors. Such a finding speaks to the exclusivity requirement, and we find that there was substantial evidence to support the chancellor’s finding that the evidence regarding this element was lacking. Additionally, we note that it is unclear whether the Knights occupied the road under a claim of title. Regardless of their claim of title, absent exclusive use, Knight could not prove adverse possession. Accordingly, we affirm the chancellor’s decision to deny Knight’s claim of adverse possession.
II. Whether the chancellor erred in awarding a prescriptive easement to the parties whose lands bordered G.K. Lane.
¶27. Next, Knight argues that the chancellor erred in finding that the use of G.K. Lane by the parties adjacent to it, along with their predecessors-in-title, was sufficient to award them prescriptive easements. Despite Knight’s argument that *1170 he should have been awarded title to G.K. Lane by adverse possession, he reaches the conclusion in the present issue that “[t]he overwhelming weight of the evidence presented contradicted any finding of a prescriptive easement to Collins or any other persons.” Knight also makes the present argument notwithstanding the fact that the chancellor also awarded him a prescriptive easement to use G.K. Lane in addition to the adjacent landowners.
¶ 28. The burden of proving a prescriptive easement is the same burden required to prove adverse possession. Keener, 912 So.2d at 956(¶ 4) (citing Thornhill, 594 So.2d at 1152). “In order to establish adverse possession or a prescriptive easement the evidence must show that possession is: (1) under claim of ownership; (2) actual or hostile; (8) open, notorious, and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful.” Id. Each of the elements of a prescriptive easement must be proven by clear and convincing evidence. Id. A successful claim of adverse possession results in the claimant receiving ownership of the property while a successful claim for a prescriptive easement results in the claimant receiving an easement to use the property.

1. Under Claim of Ownership

¶ 29. All of the parties testified that they believed they had a right to use G.K. Lane to access their properties.

2. Actual or Hostile

¶ 30. There was actual use of G.K. Lane by the concerned parties. Knight, and later his stepmother, drove down the G.K. Lane to reach the house on the road. Collins and his predecessor-in-title used the road to access the property at the end of the road.

3.Open, Notorious, and Visible

¶ 31. The record reveals that all parties involved were aware of each other’s use of G.K. Lane.

k. Continuous and Uninterrupted for a Period of Ten Years

¶ 32. The present parties and their predecessors-in-title used G.K. Lane continuously since at least the 1950s. The record indicates that at the time of the Civil War, when the road first began to see use, it passed even farther onto the property that was owned by Collins’s predecessors-in-title. Since that time, the parties have used G.K. Lane continuously, if intermittently, to access their respective properties located on the road.

5. Exclusive

¶ 33. In contrast to the exclusivity requirement for adverse possession, the supreme court has recognized a subtle distinction between the use of the term “exclusive” as applied to adverse possession and a prescriptive easement. Keener, 912 So.2d at 957(¶ 8). In reaching this conclusion, the supreme court noted this Court’s analysis in Moran v. Sims, 873 So.2d 1067, 1069(¶ 10) (Miss.Ct.App.2004), in which we stated that “[ejxclu-sivity here means that the use was consistent with an exclusive elaim to the right to use.” In Keener, the court concluded “that the distinction to be made when using the term ‘exclusive’ as it relates to a prescriptive easement does not mean to keep all others out, but to show a right to use the land above other members of the general public.” Keener, 912 So.2d at 957(¶ 8).
¶ 34. The parties to this suit and their predecessors-in-title asserted a right to use G.K. Lane to access their property. This included Knight, who would not have *1171 been able to reach the driveway to the house he owned on the property without access to G.K. Lane. We see no error with the chancellor’s finding that the parties satisfied the exclusivity requirement for a prescriptive easement.

6. Peaceful

¶ 35. There was no evidence that the various parties who owned land adjoining G.K. Lane used the road in anything but a peaceful manner. There were no disputes concerning their use of the road until Knight placed a gate across it, which resulted in the present lawsuit.
7. Conclusion
¶ 36. After finding that G.K. Lane was not a public road, a finding that none of the parties have contested on appeal, the chancellor found that the use of the road by Collins, Knight, and the Estate — and their predecessors-in-title — was sufficient to award them prescriptive easements for ingress and egress over the road. The chancellor made this award in light of the parties’ continued use of the road under the impression that they had a right to do so.
¶ 37. The present case involved a road with an origin that predated any of the witnesses who could testify as to how the road came into existence — some of the witnesses having been born as early as the 1920s. In such a situation, the following rule of law is relevant to the issue of whether it was proper to grant a prescriptive easement to present parties:
We hold that where, as in this present case, a use of the lands of another for roadway purposes has been open, visible, continuous, and unmolested since some point in time anterior to the memory of aged inhabitants of the community, such use will be presumed to have originated adversely.
Wilson v. McElyea, 815 So.2d 462, 465(¶ 11) (Miss.Ct.App.2002) (quoting McCain v. Tumage, 238 Miss. 44, 46, 117 So.2d 454, 455 (1960)).
¶ 38. In this case, the uncontradicted testimony was that the predecessors-in-title to the present parties began using G.K. Lane at a time before any living witnesses had any recollection. There was no testimony that there were any disputes among the individuals who owned land adjacent to G.K. Lane until Knight placed a fence across the road and later moved it to the end of the road. Additionally, the Estate had no objection to the possibility of the chancellor granting a prescriptive easement over any portion of G.K. Lane in which it held title.
¶ 39. The chancellor found that G.K. Lane was not a public road; however, the chancellor found that the parties to this suit presented sufficient evidence to support an award of prescriptive easements. We see no error with the chancellor’s award of prescriptive easements to those parties, and we find that this issue is without merit.
III. Whether the chancellor erred in refusing to award Knight attorney’s fees from the County.
¶ 40. Last, Knight argues that the chancellor erred in failing to require the County to pay his attorney’s fees. According to Knight, the chancellor should have awarded him attorney’s fees because the County failed to prove its case, which he argues was essentially a frivolous suit that it knew it could not win.
¶ 41. To support his argument that the chancellor should have awarded him attorney’s fees, Knight cites to Rule 11(b) of the Mississippi Rules of Civil Procedure, which provides that a court may order a party to pay for reasonable expenses incurred as a *1172 result of a frivolous pleading. Knight also cites to the Litigation Accountability Act in arguing that attorney’s fees were appropriate because the County filed suit “without substantial justification.” Miss.Code Ann. § 11-55-5(1) (Rev.2002). “The Act defines ‘without substantial justification’ as ‘frivolous, groundless in fact or in law, or vexatious, as determined by the court.’” Foster v. Ross, 804 So.2d 1018, 1022(¶ 13) (Miss.2002) (quoting Miss.Code Ann. § 11-55-3(a)).
¶ 42. The decision of whether to award attorney’s fees to a party is left to the discretion of the chancellor. Markofski v. Holzhauer, 799 So.2d 162, 168(¶ 33) (Miss.Ct.App.2001) (citing Gray v. Gray, 745 So.2d 234, 239(¶ 26) (Miss.1999)).
¶43. Knight attempts to depict the case before the chancellor as completely one-sided, arguing that the County knew that G.K. Lane was a private road and that the County only took action because of pressure from Collins. Despite these claims, the case was not so simple, and the County presented ample evidence to support its claim that G.K. Lane was a public road. Previous supervisors and county employees testified that the County maintained the road and that it was open for anyone to use. The individuals who previously owned property near or adjacent to G.K. Lane testified that the lane was unobstructed and that it was their understanding that anyone was free to use the road. The County also introduced three official county maps, from 1997, 1999, and 2000, which depicted G.K. Lane as a county road.
¶44. Ultimately, we see no merit to Knight’s claims that the County’s case was frivolous or that it was filed without substantial justification. There was no evidence that the County filed the claim in bad faith or without justification. To the contrary, the County presented ample evidence to support its claim. Accordingly, we affirm the chancellor’s decision not to award attorney’s fees to Knight.
¶ 45. THE JUDGMENT OF THE CHANCERY COURT OF COVINGTON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ROBERTS, CARLTON AND MAXWELL, JJ„ CONCUR.

. Sennett Dickens, guardian for Harold Gene Jones, non compos mentis, was the original party to the suit, but Harold Gene Jones died intestate in 2003, after which Dickens became administrator for the intestate estate.

. Vaughan was served with a summons and the pleadings, but he never answered or took part in any of the proceedings. The chancellor instructed the attorneys to prepare an order concerning Vaughan’s part of the property in question, but there is nothing in the record reflecting any judgment against Vaughan.

.The County did not appeal the chancellor’s finding that the G.K. Lane was not a public road.